IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| DIAMONDS DIRECT USA, INC., *et al.*, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) )   Civil Action No. 3:12CV303–HEH ) |
| BFJ HOLDINGS, INC., d/b/a CAPRI JEWELERS, | ) ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION**
(Granting Motion for Preliminary Injunction)

This action involves competing claims to the trademark "Diamonds Direct." Plaintiff Diamonds Direct USA, Inc. (collectively with Diamonds Direct USA of Richmond, LLC, "Diamonds Direct") has used its eponymous mark in North Carolina since 1996. On January 19, 2012, Defendant BFJ Holdings, Inc., doing business as Capri Jewelers ("Capri"), registered the "Diamonds Direct" mark with the Virginia State Corporation Commission, along with several related marks not at issue here. Indisputably, Capri registered the mark in Virginia after it learned that Diamonds Direct intended to open a store in Capri's home market of Richmond, Virginia. Capri appears to have taken this action to protect its position in the Richmond market, particularly because of its prior use of marks similar to "Diamonds Direct." Diamonds Direct initiated this lawsuit to enjoin Capri's use of the mark, and Capri has counterclaimed for similar relief,

claiming ownership of the mark pursuant to its registration in Virginia and purported first use in Virginia.

The matter is now before the Court on Defendant Capri's Motion for Preliminary Injunction (ECF No. 24).[1] The parties have conducted extensive discovery of the issues and thoroughly briefed the matter, and the Court entertained oral argument on September 19, 2012. After considering the briefs and argument, the Court has concluded that Capri has demonstrated the prerequisites for injunctive relief.

## I. FINDINGS OF FACT[2]

Since 1996, Diamonds Direct has used the mark "Diamonds Direct" continuously in Charlotte, North Carolina. (Berger Aff. at ¶ 5, ECF No. 32-1.) It expanded its use of the mark to Raleigh, North Carolina and Birmingham, Alabama in 2008. (*Id.* at ¶ 9.) By the spring of 2011, it started considering expansion to a new market. (Halford Dep. Ex. 6, ECF No. 64.) To that end, it considered the demographics of a number of markets similar to those in which it already operated, but did not necessarily consider its existing customer base. (Halford Dep. at 11:22-12:4, ECF No. 79-6; Baer Dep. at 18:22-19:16,

---

[1] The parties have also filed cross-motions for summary judgment, which were not ripe for decision at the time of the hearing on the Motion for Preliminary Injunction. The parties agree that all evidence submitted in the record may be considered to resolve the motion for preliminary injunction now under review. Regardless of the Court's decision to grant a preliminary injunction, the standards of review are highly distinct, and so the Court expresses no opinion on the merits of either motion for summary judgment.

[2] In addressing a motion for preliminary injunction, the Court is required to weigh evidence and articulate its findings of fact. *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (citation omitted).

Ex. 1, ECF No. 79-1.) Ultimately, Diamonds Direct decided to open a new store in Richmond, Virginia. (Baer Dep. at 22:1-15.)[3]

Diamonds Direct first applied for federal trademark protection in 2001, but abandoned the effort. (Def.'s Br. Opp'n Pl.'s Mot. Summ. J. Exs. D, D-5, ECF Nos. 45-3, 45-8.) Until May 2012, Diamonds Direct had never registered the mark with any state agency. It has since filed applications in North Carolina, Alabama, and Texas, the last of which has been rejected for the time being, in part because Diamonds Direct has not yet begun to sell products in Texas. (Def.'s Suppl. Opp'n Pl.'s Mot. Summ. J. Exs. E, F, G, ECF Nos. 81-16, 81-17, 81-18.) There is no evidence that it ever registered the mark in Virginia or sought to do so.

Throughout its existence, Diamonds Direct has maintained a database of all customers, including an address for each. Beginning in 1999, the database began to include a number of customers who had provided Virginia addresses. To date, approximately 700 of Diamonds Direct's 68,952 customers have given a Virginia address, representing barely more than one percent of its total customers. (Joint Stip. at 6, ECF No. 62.) Until it filed this lawsuit, Diamonds Direct had never evaluated the proportion of its customers that are from Virginia, but it had some awareness that it

---

[3] Diamonds Direct is not the only company in North Carolina to have used the "Diamonds Direct" mark. In Raleigh, North Carolina, there is another store using the name "Diamonds Direct" that has been in business since 1993. (Def.'s Br. Opp'n Pl.'s Mot. Summ. J. Ex. D-2, ECF No. 45-5.) Since 1984, another store has used the name "Diamonds Direct" in St. Petersburg, Florida. (*Id.* Ex. D-3, ECF No. 45-6.) Thus, Plaintiff Diamonds Direct's use of the mark does not appear to be exclusive throughout the southeastern United States, let alone in its home state. Nevertheless, for purposes of resolving this motion, the parties agree that Diamonds Direct has established a common law mark in North Carolina. (Sept. 19, 2012 Hrg. Tr. at 28:20-29:4, ECF No. 90.)

occasionally served some customers who provided a Virginia address. (Henis Dep. at 19:3-22:3, ECF No. 81-13; Lo Dep. at 20:3-17, ECF No. 81-14; Def.'s Br. Supp. Mot. Prelim. Inj. Ex. F, ECF No. 53.) There is no evidence of any specific purchase made in, or from, Virginia. (Henis Dep. at 34:20-35:4.) Nor is there any evidence that consumers in Virginia associate the name "Diamonds Direct" with any particular retailer. (Lo Dep. at 17:11-24.)

During the last decade, Diamonds Direct has listed the "Diamonds Direct" mark in nationally circulated magazines, some of which are distributed throughout Virginia.[4] (Pl.'s Br. Supp. Mot. Summ. J. Ex. G-1, ECF No. 32-10; Halford Dep. at 65:19-66:16.) The vast majority of these advertisements were prepared by jewelry manufacturers who supply their lines of jewelry to Diamonds Direct and, in some cases, to Capri—so-called "tag" advertisements. (Halford Dep. at 13:5-11.) At the bottom of the typical "tag" ad, the manufacturer directs readers to jewelry stores that carry its line. (Pl.'s Br. Supp. Mot. Sum J. Ex. G-2.) Manufacturers engaged in this practice offer this service to retailers for a price of about $20,000 annually—a meager portion of Diamonds Direct's multi-million dollar advertising budget. (Halford Dep. at 19:18-20:17, Ex. 7.) When identified in these "tag" ads, Diamonds Direct is always associated with the Charlotte, Raleigh, and Birmingham markets. (Def.'s Rebuttal Br. Supp. Mot. Prelim. Inj. Ex. A, ECF No. 43-1.)

---

[4] During oral argument, Diamonds Direct clarified that its advertising in these magazines focuses on regional markets, not a national market. (Sept. 19, 2012 Hrg. Tr. at 23:22-24:6.) At the same time, much of the deposition testimony refers to "national" advertising. (*See e.g.,* Halford Dep. at 18:14-23.) The distinction makes no difference, as the inquiry here focuses on the impact of advertising in Virginia, regardless of whether the advertising was circulated nationally or regionally.

Notably, these "tag" ads do not describe the Diamonds Direct model for acquiring diamonds directly from suppliers in Israel, which is at the core of its local advertising efforts. (Halford Dep. at 12:5-14:9.)

None of the "tag" ads mentions Diamonds Direct as a source of jewelry for Virginia consumers. Available evidence fails to establish whether, and to what extent, any "tag" ads resulted in sales to Virginia residents. (Halford Dep. at 28:11-29:4, 30:15-32:9.) Indeed, several such ads direct Virginia consumers to Capri and other retailers throughout Virginia. (Def.'s Rebuttal Br. Supp. Mot. Prelim. Inj. Ex. A.) Moreover, only one of the advertisements in evidence is a direct, non-"tag" advertisement prominently promoting Diamonds Direct. (Halford Dep. at 34:1-11.) Appearing on the back of several issues of *Weddings Unveiled* magazine, that ad specifically identifies Diamonds Direct locations in Birmingham, Charlotte, and Raleigh—not Virginia. (Ireland Aff. at ¶ 10, Ex. A-1, ECF No. 75-1.)

Capri has been selling jewelry in the Richmond, Virginia area since 1983. (Decapri Dep. at 7:5-7, ECF No. 32-5.) Over the past ten years, it has advertised variations of diamond sales "direct from the manufacturer," such as "Buy Direct, Save Direct," "Annual Direct Diamond Sale," and "Virginia's Largest Direct Diamond Event." (Decapri Decl. at ¶ 4, ECF No. 25-1; Def.'s Br. Supp. Mot. Prelim. Inj. Exs. B-1, B-2.) Upon discovering these advertisements, Diamonds Direct employees purportedly became confused and misinterpreted them as "diamonds direct" related advertisements going "as far back as April 2010." (Def.'s Br. Supp. Mot. Prelim. Inj. Ex. I; Halford Dep. at 97:19-99:20.)

5

On January 19, 2012, after learning that Diamonds Direct would soon open a store in the Richmond area, Capri filed its application to register the "Diamonds Direct" trademark with the Virginia State Corporation Commission. A certificate of registration was issued on January 26, 2012 with a claimed date of first use identified as January 14, 2012. (Def.'s Br. Supp. Mot. Prelim. Inj. at Ex. E.) Immediately thereafter, Capri began to use the mark "Diamonds Direct" in public advertisements distributed throughout the Richmond area. (*Id.* Ex. B-2; Pl.'s Mem. Supp. Mot. Summ. J. Exs. L, N.) On at least one occasion, a Diamonds Direct customer heard a Capri "Diamonds Direct" radio advertisement and confused it as implying an affiliation between Capri and Diamonds Direct. (Slowinski Aff. at ¶¶ 6-7, ECF No. 32-26.)

After learning that Capri had registered the "Diamonds Direct" trademark in Virginia, Diamonds Direct brought this action against Capri seeking damages and injunctive relief. It asserts claims for service mark infringement,[5] unfair competition, and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[6] Capri counterclaimed contending that it owned the "Diamonds Direct" mark in Virginia, asserting its own claims for service mark infringement and false advertising in violation

---

[5] Because both parties appear to be engaged in both the sale of goods and the performance of services, the trademark "Diamonds Direct" may also be characterized as a "service mark." 15 U.S.C. § 1127 (defining "service mark"). Because the analysis of trademark infringement is the same as service mark infringement, the Court uses the term trademark for simplicity and consistency. *Dan Tana v. Dantanna's*, 611 F.3d 767, 773 n.3 (11th Cir. 2010); *see also Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 166 n.2 (4th Cir. 2007) (using the terms "service mark" and "trademark" interchangeably).

[6] Diamonds Direct also brought a claim under Virginia's Consumer Protection Act, Va. Code §§ 59.1-196 through 59.1-207, which this Court dismissed. (Order of June 28, 2012, ECF No. 22.)

of Section 43(a) of the Lanham Act. Given the prospect of Diamonds Direct's expansion into the Richmond market and the impact that would have on both parties' use of the mark, Capri seeks a preliminary injunction based on its counterclaims. Ultimately, the dispositive issue of all claims is ownership of the "Diamonds Direct" mark.

## II. STANDARD OF REVIEW

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 525 (4th Cir. 2003) (citation omitted), *abrogated on other grounds by eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). A decision to grant a preliminary injunction is within the sound discretion of the district court. *Dewhurst*, 649 F.3d at 290 (citing *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009)). In conducting the analysis, the court must bear in mind that "[a] preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Id.* (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). It is "never awarded as of right," *Winter*, 555 U.S. at 9, but only when the moving party "establish[es] that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20 (citations omitted).

## III. DISCUSSION

Each element required for a preliminary injunction seems to favor Capri. First and foremost, Capri has clearly established that it will likely prevail on the merits of its trademark claim. Flowing from Capri's presumptive ownership of the mark, it is clear that it will suffer irreparable harm without the injunction, that the equities favor Capri, and that the public interests are served by injunctive relief. Because it is central to the analysis, the Court begins by addressing the likelihood of success on the merits.

### A. Likelihood of Success on the Merits

To prevail on its claim, Capri must establish that it owns a valid, enforceable trademark.[7] *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005). "The law of Virginia is clear that use, not registration, gives priority to trademark and service mark

---

[7] While neither party raises the issue of distinctiveness, it bears mentioning here because it impacts the likelihood of confusion analysis, *infra* at Section III(B). To enjoy protection, a trademark must be distinctive. *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 394 (4th Cir. 2009). The Fourth Circuit recognizes the following four levels of increasingly distinctive marks: (1) generic; (2) descriptive; (3) suggestive; or, (4) arbitrary or fanciful. *Id.* Generic marks are in no way distinctive and enjoy no protection. Descriptive marks enjoy protection only after acquiring secondary meaning—and there is no evidence of secondary meaning in this case. *Id.* Thus, the phrase "Diamonds Direct" enjoys protection only if it falls into the suggestive or fanciful categories. Although neither party has briefed the issue, it is apparent that "Diamonds Direct" is at least suggestive. Suggestive marks "do not describe a product's features" and "the exercise of some imagination is required to associate a suggestive mark with the product." *Id.* (citing *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 538 (4th Cir. 2004); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996)). Here, a consumer must imagine whether "Diamonds Direct" refers to jewelry shipped directly to the purchaser, obtained directly from overseas suppliers, or obtained directly from the designer. Associating the term "direct" does not merely "impart[] information," but requires further exercise of creative thought to conclude how the two words associate with each other. *Id.* (citing *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984)).

rights; registration merely serves as evidence of ownership, but this evidence may be rebutted." *Southern Christian Leadership Conference, Va. State Unit, Inc. v. Shannon*, 613 S.E.2d 596, 600 (Va. 2005).[8]

If a business has complied with all registration requirements of the Virginia Trademark and Service Mark Act ("VTSMA"), Va. Code §§ 59.1-92.1 through 59.1-92.22, the State Corporation Commission issues a certificate of registration. *Shannon*, 613 S.E.2d at 600. That certificate constitutes "*prima facie* evidence of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark within" Virginia. *Id.* (citing Va. Code § 59.1-92.6). Thus, Virginia law "creates a rebuttable presumption of ownership based upon registration." *Id.* The presumption may be rebutted by establishing that a common law mark was established before registration. *Id.* (citing Va. Code § 59.1-92.15).

"At common law, trademark ownership is acquired by actual use of the mark *in a given market*." *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 267 (4th Cir. 2003) (emphasis added) (citing *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918)). In this context, use must be "'deliberate and continuous, not sporadic, casual or transitory.'" *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 146 (4th Cir. 1998) (quoting *La Societe Anonyme*, 495 F.2d at 1271-72). Well-established precedent limits

---

[8] Where the Lanham Act is not the source of the trademark rights, state law applies. *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974). However, the test for a violation of Section 43(a) of the Lanham Act and Virginia common law unfair competition are "essentially the same . . . because both address the likelihood of confusion as to the source of the goods or services involved." *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*, 43 F.3d 922, 930 n.10 (4th Cir. 1995).

the geographic scope of trademark protection "to the locality where the mark is used and to the area of probable expansion." *Spartan Food Sys., Inc. v. HFS Corp.*, 813 F.2d 1279, 1282 (4th Cir. 1987) (citation omitted).[9]

Merely advertising a mark in a given territory is insufficient to establish use—advertisements must have the desired effect of penetrating the consumer market in that location. *Id.* at 1283-84 ("Advertising alone cannot establish common law rights" because a trademark claimant must "show the effect of such advertising."). Consistent with this common law approach, Virginia's statutory scheme defines "use" for trademark purposes as follows:

> For the purposes of [the VTSMA], a mark shall be deemed to be in use (i) on goods when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, *and the goods are sold or otherwise distributed in commerce in this Commonwealth* . . .

Va. Code § 59.1-92.2 (emphasis added).

Diamonds Direct's analysis is flawed from the start, because it begins with the conclusory premise that it owns a common law mark in Virginia. This ignores two

---

[9] Geographic boundaries are nothing new to trademark law. Well before adoption of the Lanham Act, the Supreme Court recognized that a prior user's rights may be limited in geographical scope, and that subsequent remote users may retain certain rights. In the so-called "Tea Rose-Rectanus" cases, *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916) and *United Drug Co.*, 248 U.S. 90, the Supreme Court set forth specific rules for determining whether a remote, secondary user may enjoy trademark protection over a distant user with priority. This doctrine applies as an affirmative defense where there are competing common law trademark claims—a situation distinct from that presented by the facts here. *Emergency One*, 332 F.3d at 267, 271-72. While the doctrine serves as the genesis of trademark boundaries, it has no specific application to this case.

critical elements of the analysis. First, it ignores the presumption of Capri's ownership that results from its Virginia registration of the mark. Contrary to Diamonds Direct's argument, registration indeed creates a presumption of Capri's ownership in Virginia, albeit a rebuttable one. *Shannon*, 613 S.E.2d at 600 (applying Va. Code § 59.1-92.6). Second, Diamonds Direct incorrectly claims that advertising the mark in Virginia and acquiring a few customers who happened to provide a Virginia address sufficiently establishes use of the mark in Virginia. In doing so, Diamonds Direct fails to account for the nature, extent, or effects of its advertisements. Above all, there is simply no evidence that Diamonds Direct has sold any product in Virginia that bears its mark.

Fleeting references to Diamonds Direct in magazines, often in fine print, are the sort of "casual or transitory" references that fail to establish a protectable mark. *Larsen*, 151 F.3d at 146. At first glance, references to Diamonds Direct in the "tag" advertisements are easily overlooked. It is difficult to imagine how such advertising could reinforce name or mark recognition in a given locale. In fact, each "tag" advertisement specifically directs consumers to Diamonds Direct locations in Charlotte, Raleigh, or Birmingham—explicitly limiting the stated reach of their audience. (Def.'s Rebuttal Br. Supp. Mot. Prelim. Inj. Ex. A.) So even if a Virginia resident read the fine print, he would not perceive Diamonds Direct as a source of jewelry in his market. In fact, several of these advertisements also direct consumers to other retailers located in Virginia—including Capri. (*Id.*) Because most of the advertisements direct Virginians to Virginia-based retailers, indicating only that Diamonds Direct is in North Carolina and

Alabama, it cannot be said that Diamonds Direct was "deliberately" targeting the Virginia market with these ads.

The 700 Virginia addresses listed in Diamonds Direct's database are also of minimal consequence as proof of market presence. Whether or not they have sold jewelry to customers residing beyond its market has little bearing on whether Diamonds Direct has used its mark in Virginia. Instead, the issue is whether Diamonds Direct actually used the mark in Virginia and, if so, whether it did so "deliberate[ly] and continuous[ly]" versus "sporadically." *Larsen*, 151 F.3d at 146. Significantly, the evidence fails to prove whether any Diamonds Direct advertisements in Virginia enticed a Virginian to travel to Diamonds Direct outlets in North Carolina or Alabama or even to purchase jewelry from it by telephone. *See Spartan Food Sys.*, 813 F.2d at 1283 ("Advertising alone cannot establish common law rights."). At minimum, Diamonds Direct must show that the advertisements had the desired effect of drawing at least some Virginians to its stores, or prompted them to purchase jewelry by phone. *Id.* at 1283-84. There is no indication that any of these customers—representing only about one percent of its total customer base—even saw a Diamonds Direct advertisement in Virginia.

According to Diamonds Direct's theory, it is entitled to a common law trademark in every territory that the mark finds itself once it is placed in the stream of commerce. This cannot be the case, as such an outcome would contradict well-established trademark jurisprudence. *Emergency One*, 332 F.3d at 267; *Larsen*, 151 F.3d at 146; *Spartan Food Sys.*, 813 F.2d at 1283; *Pizzeria Uno Corp.*, 747 F.2d at 1536; *Armand's Subway, Inc. v. Doctor's Associates, Inc.*, 604 F.2d 849, 851 (4th Cir. 1979). Diamonds Direct's

12

purported use of the subject mark in Virginia is insufficient to establish a common law mark here. Thus, Capri's presumptive ownership of the mark has not been rebutted, and so it appears highly likely that Capri will prevail on this issue.[10]

## B. Irreparable Harm

"In Lanham Act cases involving trademark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion, the key element in an infringement case." *Scotts v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002) (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997)). To determine whether a likelihood of confusion exists, the Fourth Circuit has set forth a seven-factor test: (1) the distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods and services that the marks identify; (4) the similarity of the facilities that the two parties use; (5) the similarity of the

---

[10] Diamonds Direct also argues that Richmond, Virginia is within its "natural zone of expansion." (Pl.'s Br. Opp'n Mot. Prelim. Inj. at 2.) As Diamonds Direct acknowledges, this doctrine requires the Court to consider: (1) previous business activity; (2) previous expansion or lack thereof; (3) dominance of contiguous areas; (4) presently-planned expansion; and (5) possible market penetration by means of products brought from other areas. *Spartan Food Sys.*, 813 F.2d at 1283. As the Court has already explained, Diamonds Direct has not established any meaningful previous business activity in Virginia. Its expansion efforts also do not point towards Virginia—the most recent expansion was in Birmingham, Alabama and, more recently, Diamonds Direct has taken steps to expand into Texas. Although the states of North Carolina and Virginia share a contiguous border, Richmond is not contiguous with Diamonds Direct's closest established market in Raleigh. It also falls far short of satisfying the four factors of market penetration: (1) the volume of sales; (2) the growth trends in the area; (3) the number of persons actually purchasing the product in relation to potential customers; and, (4) the amount of product advertising in Richmond. *Id.* (citation omitted). Thus, Diamonds Direct has failed to show that Richmond is in its "natural zone of expansion."

advertising of the two parties; (6) the defendant's intent; and, (7) actual confusion. *Lone Star Steakhouse*, 43 F.3d at 933 (citing *Pizzeria Uno Corp.*, 747 F.2d at 1527). "[N]ot all of these factors are of equal relevance in every case." *Id.* (citation omitted).

Each factor weighs in favor of a finding of confusion. As the Court previously explained, *supra* at note 8, the "Diamonds Direct" mark enjoys the second highest strength of distinctiveness—suggestive. Not only are the marks similar, they are identical. The two companies are also in identical industries and selling identical goods at similarly-styled retail locations. Absent the injunction, they will do so within close proximity to each other once Diamonds Direct opens its Richmond location. The advertising is very similar; in fact, they are sometimes named in the exact same "tag" ads.

The case for confusion is even stronger when the evidence of actual confusion is considered. By its own direct evidence, Diamonds Direct has established actual confusion by one of its longtime customers. (Slowinski Aff. at ¶¶ 6-7.) Even its own employees confused Capri's previous variations of "direct diamond" advertising with the "Diamonds Direct" mark—confusion likely to get worse once the two companies are using the exact same mark in the exact same market. (Def.'s Br. Supp. Mot. Prelim. Inj. Ex. I.) Having offered no evidence to the contrary, the Court must presume that irreparable harm will result if it fails to issue the requested preliminary injunction.

C.  **Balance of Equities**

The equities favor Capri, especially given the high likelihood of success on the merits. Contrary to Diamonds Direct's insinuation of bad faith registration, (Pl.'s Suppl. Tea Rose-Rectanus Br. at 2, ECF No. 83-1), the evidence establishes that Capri has used

a number of variations of the "direct diamond" theme for at least 10 years. (Decapri Decl. at ¶ 4; Def.'s Br. Supp. Mot. Prelim. Inj. at Exs. B-1, B-2.) Upon learning of Diamonds Direct's forthcoming arrival to the Richmond market, Capri perceived a likelihood of confusion between its already-employed advertising scheme and that of Diamonds Direct. Capri made the tactical, legal business decision to register the mark with the Virginia State Corporation Commission to protect its long established market share. Given its existing advertising scheme and the fact that Diamonds Direct had not yet established a presence in Richmond, registration of the mark could hardly constitute bad faith.

Because Capri is well-established in the Richmond market, but Diamonds Direct is not, a preliminary injunction will merely "protect the status quo." *In re Microsoft Corp.*, 333 F.3d at 525 (citation omitted). Considering the potential harm to Capri and the minimal harm an injunction might have on Diamonds Direct, the equities favor injunctive relief in Capri's favor.[11]

### D. Public Interest

The twin aims of trademark law are to "protect the public from deceit" and to protect "investment from its misappropriation by pirates and cheats." *Two Pesos v. Taco Cabana*, 505 U.S. 763, 782 n.15 (1992) (Stevens, J. concurring) (citing S. Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946)). Here, both of those aims are served by preliminarily

---

[11] In fact, the parties agreed at oral argument that the injunctive relief may be secured by a $25,000 bond, which represents the approximate cost of a sign that Diamonds Direct had purchased for its new location. By requiring the agreed-upon bond in its Order, the Court will ensure that Diamonds Direct's interests are adequately secured pending a final judgment.

enjoining Diamonds Direct's use of the mark in Virginia. It has already been established that confusion will result if Diamonds Direct is permitted to proceed. Thus, the foremost public policy aim of trademark protection is served by enjoining Diamonds Direct. And since Capri is the presumptive owner of the mark, its investment can be protected only through injunctive relief.

### IV. CONCLUSION

In sum, the Court is satisfied that Capri is likely to prevail on the merits of its counterclaim, that it will suffer irreparable harm if the injunction does not issue, that the balance of equities favors Capri, and that a preliminary injunction furthers the public interest. Accordingly, Capri's Motion for Preliminary Injunction will be granted, and Diamonds Direct will be enjoined from use of the "Diamonds Direct" mark in the Richmond, Virginia market during the pendency of this litigation.

Counsel for Capri are directed to submit a proposed order establishing the parameters of the injunction consistent with this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: Oct. 2 2012
Richmond, Virginia