IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DIAMONDS DIRECT USA, INC.,       )
*et al.*,                          )
                                 )
      Plaintiffs,             )
                                 )
v.                               )       Civil Action No. 3:12CV303–HEH
                                 )
BFJ HOLDINGS, INC.,              )
d/b/a CAPRI JEWELERS,            )
                                 )
      Defendant.              )

## MEMORANDUM OPINION
### (Cross Motions for Summary Judgment)

This lawsuit involves competing claims to the "Diamonds Direct" trademark[1] in portions of the Virginia market.  It is undisputed that Plaintiff Diamonds Direct USA, Inc. (collectively with Diamonds Direct USA of Richmond, LLC, "Diamonds Direct") has continuously used the "Diamonds Direct" mark in North Carolina since 1996.  On January 19, 2012, Defendant BFJ Holdings, Inc., doing business as Capri Jewelers ("Capri"), registered the "Diamonds Direct" mark with the Virginia State Corporation Commission, along with several related marks not at issue here.  Diamonds Direct brought suit to enjoin Capri's use of the mark, and Capri has counterclaimed that it owns the mark pursuant to its registration and first use in Virginia.

---

[1] Although the "Diamonds Direct" mark may also be characterized as a "service mark," 15 U.S.C. § 1127 (defining "service mark"), the distinction is immaterial. *Dan Tana v. Dantanna's*, 611 F.3d 767, 773 n.3 (11th Cir. 2010); *see also Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 166 n.2 (4th Cir. 2007) (using the terms "service mark" and "trademark" interchangeably).  For simplicity, the Court uses the term "trademark" or "mark."

The matter is now before the Court on the parties' cross motions for summary judgment (ECF Nos. 31, 69). The parties have conducted extensive discovery and have thoroughly briefed the matter, including several supplemental submissions by both parties, and the Court entertained oral argument on November 1, 2012. After considering the briefs and argument, the Court concludes that Capri is entitled to summary judgment.

## I. BACKGROUND

The Court has reviewed each party's statement of undisputed facts, including the extensive supporting documentation. Applying the appropriate standard pursuant to Fed. R. Civ. P. 56, the following narrative represents the facts germane to the pending motions.

Since 1996, Diamonds Direct has used the mark "Diamonds Direct" continuously in Charlotte, North Carolina. (Berger Aff. at ¶ 5, ECF No. 32-1.) It expanded its use of the mark to Raleigh, North Carolina and Birmingham, Alabama by 2008. (*Id.* at ¶ 9.) In the spring of 2011, it began exploring expansion to a new market. (Halford Dep. Ex. 6, ECF No. 64.) In making this decision, Diamonds Direct considered the demographics of a number of markets similar to those in which it already operated. (Halford Dep. at 11:22-12:4, ECF No. 79-6; Baer Dep. at 18:22-19:16, Ex. 1, ECF No. 79-1.) Ultimately, Diamonds Direct decided to open a new store in Richmond, Virginia. (Baer Dep. at 22:1-15.)

Diamonds Direct first applied for federal trademark protection in 2001, but abandoned the effort. (Def.'s Br. Opp'n Pl.'s Mot. Summ. J. Exs. D, D-5, ECF Nos. 45-3, 45-8.) Until May 2012, Diamonds Direct had never registered its mark with any state

agency. It has since filed applications in North Carolina, Alabama, and Texas. (Def.'s Suppl. Opp'n Pl.'s Mot. Summ. J. Exs. E, F, G, ECF Nos. 81-16, 81-17, 81-18.) There is no evidence that it ever registered the mark in Virginia or even sought to do so.

Throughout its existence, Diamonds Direct has maintained a database of its approximately 68,952 customers, including an address for each. (Joint Stip. At 6, ECF No. 62.) The database includes approximately 700 customers who have provided Virginia addresses since 1999, including about 280 in the Richmond, Virginia market. (Hrg. Tr. at 9:10-12, ECF No. 114.) Although its records do not reflect the manner of these transactions, Diamonds Direct's employees explain that it would have sold products to Virginians in person when those customers visited one of Diamonds Direct's locations in North Carolina or Alabama or remotely by mail.[2] (Henis Dep. at 19:3-22:3, ECF No. 81-13; Lo Dep. at 20:3-17, ECF No. 81-14.) Virginia customers represent barely more than one percent of Diamonds Direct's total customers, with customers in the Richmond market accounting for less than half of one percent. (Joint Stip. at 6.) There is no

---

[2] Itay Berger ("Berger"), the CEO of Diamonds Direct, has asserted that his company "started doing business in the Commonwealth of Virginia in 1999 when it used the 'Diamonds Direct' mark in connection with sales to its first 16 Virginia customers." (Berger Aff. at ¶ 6.) This statement is misleading if it implies that any transactions occurred exclusively in Virginia, because Berger also testified at his deposition that sales to Virginians occurred exclusively through mail-order or by in-person purchase at one of Diamonds Direct's stores in other states. (Berger Dep. at 26:22-27:9, ECF No. 43-2.) Such conflicting testimony does not create a genuine dispute of material fact, because "[i]t is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct." *Grace v. Family Dollar Stores, Inc. (In re Family Dollar FLSA Litigation)*, 637 F.3d 508, 512 (4th Cir. 2011). Moreover, because "summary judgment affidavits cannot be conclusory," the fact-based testimony trumps the conclusory statements contained in the affidavit. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citations omitted).

evidence of any particular transaction made in, or from, Virginia. (Henis Dep. at 34:20-35:4.) Nor is there any evidence that consumers in Virginia associate the name "Diamonds Direct" with any particular retailer. (Lo Dep. at 17:11-24.) Indeed, there is absolutely no evidence that this mark has any meaning to Virginia customers generally.

During the last decade, advertisements displaying the "Diamonds Direct" mark have appeared in nationally circulated magazines, some of which are distributed throughout Virginia. (Pl.'s Br. Supp. Mot. Summ. J. Ex. G-1, ECF No. 32-10; Halford Dep. at 65:19-66:16.) The bulk of these advertisements were prepared by jewelry manufacturers who supply their lines of jewelry to Diamonds Direct and, in some cases, to Capri—so-called "tag" advertisements. (Halford Dep. at 13:5-11.) At the bottom of the typical "tag" ad, the manufacturer directs readers to jewelry stores that carry its line. (Pl.'s Br. Supp. Mot. Sum J. Ex. G-2.) When identified in such "tag" ads, Diamonds Direct is exclusively identified as a retailer in the Charlotte, Raleigh, and Birmingham markets. (Pl.'s Br. Supp. Mot. Summ. J. Exs. G-1, G-2, G-3.)

Not one "tag" ad mentions Diamonds Direct as a source of jewelry for Virginia consumers. Record evidence fails to establish whether, and to what extent, any "tag" ads ever resulted in sales to Virginia residents. (Halford Dep. at 28:11-29:4, 30:15-32:9.) Indeed, several such ads direct Virginia consumers to Capri and other retailers throughout Virginia. (Pl.'s Br. Supp. Mot. Summ. J. Exs. G-1, G-2, G-3; Def.'s Br. Opp'n Mot. Summ. J. at 14 (citing Def.'s Rebuttal Br. Supp. Mot. Prelim. Inj. Ex. A, ECF No. 43-1).) A stand lone advertisement appearing in *Weddings Unveiled* magazine prominently displays the "Diamonds Direct" name in an easily readable form. (Halford Dep. at 34:1-

4

11.)  Still, that ad specifically identifies Diamonds Direct locations in Birmingham, Charlotte, and Raleigh—not Virginia. (Ireland Aff. at ¶ 10, Ex. A-1, ECF No. 75-1.)

Capri has been selling jewelry in the Richmond, Virginia area since 1983. (Decapri Dep. at 7:5-7, ECF No. 32-5.) Over the past ten years, it has advertised variations of diamond sales "direct from the manufacturer," such as "Buy Direct, Save Direct," "Annual Direct Diamond Sale," and "Virginia's Largest Direct Diamond Event." (Decapri Decl. at ¶ 4, ECF No. 25-1; Def.'s Br. Supp. Mot. Prelim. Inj. Exs. B-1, B-2.) Upon discovering these advertisements, Diamonds Direct employees purportedly became confused and misinterpreted them as "diamonds direct" related advertisements going "as far back as April 2010." (Def.'s Br. Supp. Mot. Prelim. Inj. Ex. I; Halford Dep. at 97:19-99:20.)

On January 19, 2012, after learning that Diamonds Direct would soon open a store in the Richmond area, Capri filed its application to register the "Diamonds Direct" trademark with the Virginia State Corporation Commission. (Pl.'s Br. Supp. Mot. Sum J. Ex. D.) A certificate of registration was issued on January 26, 2012 with a claimed date of first use identified as January 14, 2012. (*Id.* Ex. H.) Immediately thereafter, Capri began to use the mark "Diamonds Direct" in public advertisements distributed throughout the Richmond area. (*Id.* Exs. K, L, M, N.) On at least one occasion, a Diamonds Direct customer heard a Capri "Diamonds Direct" radio advertisement and mistakenly assumed a relationship between Capri and Diamonds Direct. (Slowinski Aff. at ¶¶ 6-7, ECF No. 32-26.)

5

After learning that Capri had registered the "Diamonds Direct" trademark in Virginia, Diamonds Direct brought this action against Capri seeking damages and injunctive relief. It asserts claims for service mark infringement, unfair competition, and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[3] Capri counterclaimed contending that it owned the "Diamonds Direct" mark in Virginia, asserting its own claims for service mark infringement and false advertising in violation of Section 43(a) of the Lanham Act. Capri moved for a preliminary injunction based on its counterclaims, which this Court granted on October 2, 2012 (ECF No. 103). The parties have now filed cross motions for summary judgment (ECF Nos. 31, 69), which are ripe for decision. The dispositive issue remains the ownership of the "Diamonds Direct" mark.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Thus, the court must view the record in the light most favorable to the nonmoving party, and must draw all reasonable inferences in its favor. *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). However, "the mere existence of a scintilla of evidence in support of the

---

[3] Diamonds Direct also brought a claim under Virginia's Consumer Protection Act, Va. Code §§ 59.1-196 through 59.1-207, which this Court dismissed. (Order of June 28, 2012, ECF No. 22.)

6

[nonmoving party's] position will be insufficient." *Anderson*, 477 U.S. at 252; *see also Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson v. Everett, Inc. v. Nat'l Cable Adver., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995).

### III. DISCUSSION

This Court's analysis begins by acknowledging that, as a matter of Virginia law, Capri enjoys presumptive ownership of the mark. Despite the presumption, more is required to determine which party has superior rights to the mark. Diamonds Direct may rebut Capri's presumptive ownership if it can show that it had established an earlier common law mark in Virginia. However, Diamonds Direct has failed to offer evidence sufficient to meet the standard to do so.

### A.   Capri's Presumptive Ownership of the Mark

To prevail on its claim, Capri must establish that it owns a valid, enforceable trademark. *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005). "The law of Virginia is clear that use, not registration, gives priority to trademark and service mark rights; registration merely serves as evidence of ownership, but this evidence may be rebutted." *Shannon*, 613 S.E.2d at 600. As the Fourth Circuit aptly explained, "registration 'shifts the burden of proof from the plaintiff . . . to the defendant, who must introduce sufficient evidence to rebut the presumption of plaintiff's right to such [exclusive] use.'" *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 269

(4th Cir. 2003) (alterations in the original) (quoting *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 (4th Cir. 1984)).[4]

If a business has complied with all registration requirements of the Virginia Trademark and Service Mark Act ("VTSMA"), Va. Code §§ 59.1-92.1 through 59.1-92.22, the State Corporation Commission issues a certificate of registration. *Shannon*, 613 S.E.2d at 600. That certificate constitutes "*prima facie* evidence of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark within" Virginia. *Id.* (citing Va. Code § 59.1-92.6). It is undisputed that Capri registered the mark in January of this year, effectively shifting the burden to Diamonds Direct.

**B.    Diamonds Direct Fails to Establish Use of the Mark in Virginia**

"At common law, trademark ownership is acquired by actual use of the mark *in a given market*." *Emergency One*, 332 F.3d at 267 (emphasis added) (citing *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918)). In this context, use must be "'deliberate and continuous, not sporadic, casual or transitory.'" *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 146 (4th Cir. 1998) (quoting *La Societe Anonyme*, 495 F.2d at 1271-72). Well-established precedent limits the geographic scope of trademark protection "to the locality where the mark is used and to the area of probable expansion." *Spartan Food Sys., Inc. v. HFS Corp.*, 813 F.2d 1279, 1282 (4th Cir. 1987) (citation omitted).

---

[4] Where the Lanham Act is not the source of the trademark rights, state law applies. *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974). However, the test for a violation of Section 43(a) of the Lanham Act and Virginia common law unfair competition are "essentially the same . . . because both address the likelihood of confusion as to the source of the goods or services involved." *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*, 43 F.3d 922, 930 n.10 (4th Cir. 1995).

Merely advertising a mark in a given territory is insufficient to establish use—

advertisements must have the desired effect of penetrating the consumer market in that

location. *Id.* at 1283-84 ("Advertising alone cannot establish common law rights"

because a trademark claimant must "show the effect of such advertising."). Consistent

with this common law approach, Virginia's statutory scheme defines "use" for trademark

purposes as follows:

> For the purposes of [the VTSMA], a mark shall be deemed to be in use (i)
> on goods when it is placed in any manner on the goods or their containers
> or the displays associated therewith or on the tags or labels affixed thereto,
> or if the nature of the goods makes such placement impracticable, then on
> documents associated with the goods or their sale, *and the goods are sold*
> *or otherwise distributed in commerce in this Commonwealth . . .*

Va. Code § 59.1-92.2 (emphasis added).

To establish a preexisting common law mark, Diamonds Direct relies on a

combination of its advertising efforts in Virginia and the increasing number of Virginia

customers listed in its database.[5] But its evidence fails to show any relationship between

_____

[5] Diamonds Direct has also argued that Capri's alleged bad faith warrants relief in
its favor. It remains unclear how, and under what authority, the Court could reach such a
conclusion. Typically, the issue of good faith analysis arises under the *Tea Rose-*
*Rectanus* doctrine, which is an affirmative defense not raised in this case. *See Emergency*
*One*, 332 F.3d at 271-272 (discussing *United Drug Co.*, 248 U.S. 90; *Hanover Star*
*Milling Co. v. Metcalf*, 240 U.S. 403 (1916)) ("[A] good-faith remote user claim is
typical of an affirmative defense"). Such situations involve a good-faith remote user
whose territory is then penetrated by a senior user from another market. Here, the
opposite situation is presented, as the supposedly good-faith remote user—Diamonds
Direct—is the party attempting to penetrate a new market. The affirmative defense raised
here is one of general unclean hands, which is an equitable defense requiring the
invoking party to demonstrate its own good faith. *Richards v. Musselman*, 267 S.E.2d
164, 166-67 (Va. 1980). Diamonds Direct has failed to show that it is entitled to this
equitable defense given what appears to be inequitable conduct of its own, including
apparent plans to intentionally drive Capri out of business. (*See, e.g.,* Def.'s Br. Supp.

the advertisements and the Virginia based transactions.  As the Fourth Circuit recognizes, a trademark claimant must "show the effect of such advertising." *Spartan Food Sys.*, 813 F.2d at 1283.  The lack of evidence on this point is glaring.

At most, Diamonds Direct offers evidence that approximately one percent of its customers are Virginia residents and that its name appears in some magazine advertisements distributed in Virginia.  Notably, there is no evidence of any particular sale in Virginia.  Some Virginians made purchases over the telephone while others visited an outlet, but there is no empirical evidence of a consistent pattern of transactions with Virginia based customers.  (Hrg. Tr. at 8:9-13.)  And regardless of the frequency of either transaction, Diamonds Direct still must offer evidence showing that at least some portion of its Virginia customers purchased its products *because* they saw advertisements in Virginia.  It offers none.

Occasional, passing references to Diamonds Direct in magazine advertisements are exactly the type of "casual or transitory" references to a mark that fail to establish use in a particular market.  *Larsen*, 151 F.3d at 146.  References to Diamonds Direct in "tag" advertisements are in fine print, so they are easily missed.  Even then, each "tag" advertisement specifically directs consumers to Diamonds Direct locations in Charlotte, Raleigh, or Birmingham—explicitly limiting the stated reach of their market.[6]  (Def.'s

---

Mot. Prelim. Inj. Sealed Ex. D, ECF No. 53.)  Under these circumstances, evidence of bad faith on either side appears to be immaterial to the determination of trademark ownership.

[6] At oral argument, Diamonds Direct cited *Emergency One* for the proposition that "there's nothing that says that the qualifying use must target customers in Virginia." (Hrg. Tr. at 9:22-24.)  The Court does not conclude that there exists a bright-line rule that

Rebuttal Br. Supp. Mot. Prelim. Inj. Ex. A.)  So even if a Virginia resident read the fine print, he would not necessarily perceive Diamonds Direct as a source of jewelry in this market.  In fact, several of these advertisements also direct consumers to other retailers located in Virginia—including Capri.  (*Id.*)  Based on this evidence, the Court cannot conclude that Diamonds Direct was "deliberately" targeting the Virginia market with the ads in evidence.

It remains undisputed that about 700 Diamonds Direct customers provided Virginia addresses.  But whether or not it has sold jewelry to customers residing beyond its market is immaterial.  The central issue is whether Diamonds Direct actually used the mark in Virginia and, if so, whether it did so "deliberate[ly] and continuous[ly]," as opposed to "sporadically."  *Larsen*, 151 F.3d at 146.  Significantly, the evidence fails to prove whether any Diamonds Direct advertisements in Virginia enticed a Virginian to travel to Diamonds Direct outlets in North Carolina or Alabama or even to purchase jewelry from it by telephone.  *See Spartan Food Sys.*, 813 F.2d at 1283 ("Advertising alone cannot establish common law rights.").  At minimum, Diamonds Direct must show that the advertisements had the desired effect of drawing at least some Virginians to its stores, or prompted them to purchase jewelry by phone.  *Id.* at 1283-84.  Without

---

advertisements must target a particular market to establish use.  But to rely on advertisements to show use of the mark in Virginia, Diamonds Direct must, at a minimum, "show the effect of such advertising" in Virginia.  *Spartan Food Sys.*, 813 F.2d at 1283.  There is nothing about this rule that is inconsistent with the holding in *Emergency One*.  The issue there was not *use* of a mark in the first instance, but *abandonment* of a mark that was indisputably established in the relevant market by evidence of sales volume—not advertisements.  332 F.3d at 270.  Diamonds Direct's reliance on *Emergency One* is misplaced in this respect.

bridging the gap between ads and sales, Diamonds Direct cannot establish the necessary correlation.

At oral argument, Diamonds Direct attempted to overcome these shortcomings by arguing that the Court was holding it to a higher standard than case law allows, specifically citing the cases of *Kyhos v. Perpetual Sav. & Loan Ass'n*, 480 F.2d 204 (4th Cir. 1973), and *Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156 (4th Cir. 1962). Based on these decisions, Diamonds Direct argues that it can establish first use of the mark by the mere appearance of its name in several magazines circulated in Virginia—regardless of the impact those ads might have had in Virginia. (Hrg. Tr. at 5:24-8:8, 9:21-24.) Once again, Diamonds Direct misses the point. In both cited cases, there was evidence of pre-established name recognition and secondary meaning of the mark—evidence absent here.

To illustrate, the plaintiff in *Food Fair* offered evidence that "the name FOOD FAIR was well and favorably known in the [Norfolk, Virginia] area *and had attained a secondary meaning* prior to the opening of its FOOD FAIR store by [the defendant]." 301 F.2d at 159 (emphasis added). There was also evidence that area residents "were familiar with the FOOD FAIR name and *identified it with the plaintiff*." *Id.* (emphasis added). Diamonds Direct has offered absolutely no evidence that its name has any meaning to Virginia consumers. Just as such evidence was crucial to the Fourth Circuit's decision in *Food Fair*, its absence here undermines Diamonds Direct's argument.

Diamonds Direct's reliance on *Kyhos* further emphasizes the weakness of its case, because the record in that case contained a survey showing that 43.4% of the market

12

residents were aware of the plaintiff's mark and 12.7% of them identified the mark with the plaintiff's business. *Kyhos*, 480 F.2d at 209. The Fourth Circuit found that such evidence was sufficient to establish that the mark "could have acquired a secondary meaning in" the relevant market. *Id.* Again, Diamonds Direct has offered *no evidence* that its mark had any meaning to the Virginia consumer before Capri's registration and use.

Well-established trademark jurisprudence limits the geographical reach of common law marks. *Emergency One*, 332 F.3d at 267; *Larsen*, 151 F.3d at 146; *Spartan Food Sys.*, 813 F.2d at 1283; *Pizzeria Uno Corp.*, 747 F.2d at 1536; *Armand's Subway, Inc. v. Doctor's Associates, Inc.*, 604 F.2d 849, 851 (4th Cir. 1979). While it is undisputed that Diamonds Direct owns its eponymous mark in North Carolina, the depth of its footprint in Virginia is simply too shallow to warrant the protection that it seeks.

C.     **Natural Zone of Expansion**

As an alternative theory, Diamonds Direct argues that Richmond, Virginia is within its "natural zone of expansion." (Pl.'s Br. Supp. Mot. Summ. J. at 9-10.) This requires the Court to consider its: (1) previous business activity; (2) previous expansion or lack thereof; (3) dominance of contiguous areas; (4) presently-planned expansion; and (5) possible market penetration by means of products brought from other areas. *Spartan Food Sys.*, 813 F.2d at 1283. The last of these factors—market penetration—requires consideration of four additional elements: (1) the volume of sales; (2) the growth trends in the area; (3) the number of persons actually purchasing the product in relation to

13

potential customers; and, (4) the amount of product advertising in the target market. *Id.* (citation omitted).[7]

Diamonds Direct has not established any meaningful previous business activity in Richmond, Virginia. Sales to Richmond area residents are less than half of one percent of Diamonds Direct's total sales. Its expansion efforts also do not point towards Virginia—the most recent expansion was in Birmingham, Alabama and, more recently, Diamonds Direct has taken steps to expand into Texas. True, Diamonds Direct made a decision to expand northward for the first time by choosing a market similar to Raleigh, North Carolina—but it did so after establishing an expansion trend directed farther south and west of its North Carolina market. And while the states of North Carolina and Virginia share a contiguous border, Richmond is not immediately contiguous with Diamonds Direct's closest established market in Raleigh.

Diamonds Direct also falls short of satisfying the four elements related to market penetration. As the Court has already explained, the volume of sales to Richmond area residents is a small percentage of the company's total sales. While sales to Virginia residents over the past couple of years exhibit an upward trend, Diamonds Direct has not offered evidence showing what percentage of its annual sales came *from* Virginia during

---

[7] Diamonds Direct has suggested that it can unilaterally determine its "zone of natural expansion" without offering evidence addressing these factors. (Hrg. Tr. at 12:20-13:19.) Although the doctrine is a "legal construct," as Diamonds Direct describes it, there must still be sufficient evidence for the Court to address the variables of the calculus. Unilateral actions by Diamonds Direct are but one piece of the equation. There is no authority rendering such actions dispositive of the entire analysis, as Diamonds Direct appears to argue.

the past few years.[8] Finally, Diamonds Direct has failed to show that its advertising efforts in Virginia had any definable impact. Given such a lack of specific evidence on these points, it cannot establish market penetration in Richmond.

Once again directing the Court's attention to the cases of *Food Fair* and *Kyhos*, Diamonds Direct emphasizes the relatively close geographic proximity between Richmond and Raleigh. (Hrg. Tr. at 11:9-20.) By comparison, Diamonds Direct points out that the cities in both of those cases were farther apart than the distance from Richmond to Raleigh. (*Id.*) But the critical analysis in both of those cases was not the distance between markets, but the evidence that the subject mark had acquired name recognition in the target market. *Kyhos*, 480 F.2d at 209 ("The poll . . . showed that 43.4% of those surveyed by telephone in the [area] knew of a company with 'Perpetual' in its name in the Washington, D.C. metropolitan area, and 12.7% gave the name of the company as Perpetual Building."); *Food Fair*, 301 F.2d at 159 ("[T]he name FOOD FAIR was well and favorably known in the area and had attained a secondary meaning"). There is absolutely no such evidence in this case.

Diamonds Direct has not offered sufficient evidence to establish that Richmond, Virginia was in its natural zone of expansion. Accordingly, it has not rebutted Capri's presumptive ownership of the mark.

---

[8] If such evidence does exist in the record, the Court cannot find it, and Diamonds Direct has failed to cite such evidence with particularity as required by Fed. R. Civ. P. 56(c)(1)(A).

## IV. CONCLUSION

Given Diamonds Direct's failure to offer evidence establishing its prior use of the mark in Virginia, Capri's presumptive ownership of the trademark stands unrebutted. Capri's Motion for Summary Judgment will be granted, Diamonds Direct's Motion for Summary Judgment will be denied, and the Court will permanently enjoin Diamonds Direct from using the "Diamonds Direct" trademark in the Richmond, Virginia market.

An appropriate Order will accompany this Memorandum Opinion, resolving the pending motions and directing the parties to submit an order setting forth the scope of the permanent injunction.

/s/
Henry E. Hudson
United States District Judge

Date: Nov. 9 2012
Richmond, Virginia